1  Mark Schlein, Trial Counsel
   FL Bar No. 000700
2  mschlein@baumhedlundlaw.com
   (Pro Hac Vice to be submitted)
3  Diane Marger Moore, FL Bar No. 268364
   (Pro Hac Vice to be submitted)
4  Bijan Esfandiari, CA Bar No. 223216
   BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
5  12100 Wilshire Blvd., Suite 950
   Los Angeles, CA 90025
6  Tel: 310-207-3233
   Fax: 310-207-4204

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10                              SAN DIEGO DIVISION

11  UNITED STATES OF AMERICA,              )  CIVIL ACTION NO.
    and THE STATE OF CALIFORNIA,           )
12                                         )  '12 CV 2866 CAB KSC
    ex rel. LORI A. RACHAC, R.N.,          )
13                                         )  FALSE CLAIMS ACT COMPLAINT
         PLAINTIFF AND RELATOR,            )  AND DEMAND FOR JURY TRIAL
14                                         )
         v.                                )
15                                         )  FILED IN CAMERA
    SAN DIEGO HOSPICE & PALLIATIVE CARE    )  AND UNDER SEAL
16  CORPORATION, a/k/a SAN DIEGO HOSPICE,  )
    CORP. a/k/a INSTITUE FOR PALLIATIVE    )
17  MEDICINE AT SAN DIEGO HOSPICE,         )
                                           )
18       DEFENDANT.                        )
                                           )
19

20       Lori A. Rachac, R. N. ("Relator") brings this action on behalf of the United States of America

21  ("United States") for treble damages and civil penalties arising from the conduct of Defendant San

22  Diego Hospice & Palliative Care Corporation (referred to herein as "SDH") a/k/a San Diego Hospice

23  Corporation and a/k/a Institute for Palliative Medicine at San Diego Hospice ("SDHIPM") in violation

24  of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of

25  false claims for payment made to Medicare, Medicaid, TRICARE, f/k/a CHAMPUS and

26  CHAMPUSVA, Federal Employees' Health Benefits Program and other federally funded government

27  healthcare programs (hereinafter, collectively referred to as "Government Healthcare Programs"). This

28

ORIGINAL                          1              FALSE CLAIMS ACT COMPLAINT

action is also brought under the *qui tam* provisions of the California False Claims Act on behalf of the State of California.

## I. BACKGROUND

1. "Hospice care is an approach to caring for the **terminally ill** individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life. A hospice uses an interdisciplinary approach to deliver medical, social, physical, emotional, and spiritual services through the use of a broad spectrum of caregivers." Federal Register /Vol. 73, No. 109. http://www.gpo.gov/fdsys/pkg/FR-2008-06-05/pdf/08-1305.pdf. 42 C.F.R. §418 *et seq.* [Emphasis supplied.]

2. Under the Social Security Act (42 U.S.C. §§ 1302 and 1395hh, *et seq.*), "An individual is 'terminally ill' if he or she has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A). This definition is further clarified at 42 C.F.R. §418.3 to provide for a life expectancy of 6 months or less "if the illness runs its normal course."

3. Hospice benefits have been included under Medicare Part A since 1982, covering a range of services from pain management, bereavement counseling to a range of other palliative care services to patients who have a terminal illness and have opted to forgo curative treatment. The focus is on making a patient and his family as comfortable as possible in the final months of life.

4. Hospice is a multibillion-dollar nationwide industry, with extraordinary growth rates over the last decade. Medicare payments to hospice programs have increased from approximately $3 billion in 2000 to $13 billion in 2010. In San Diego County alone, Medicare hospice benefit expenditures grew from about $74 million in 2002 to $226 million in 2011, according to California's Office of Statewide Planning and Development.

5. San Diego Hospice & Palliative Care Corporation ("SDH") was established in 1977 and claims to be the first hospice program in San Diego County. It serves a large geographic and population area with more than three million people and an area of about 4,200 square miles.

6. In 1979, SDH became a licensed home health agency, providing specialized health care and support for the terminally ill. Services included nursing and home health services as well as continuing emotional and practical support provided by trained professionals in social work, counseling and bereavement. Over the years, the organization has seen dramatic growth, currently providing services to nearly 1,000 adults and children each day throughout the county.

7. As alleged herein, for more than seven years Defendant caused thousands of false claims to be made on federal health care programs, primarily Medicare. Defendant accomplished this by knowingly admitting and/or retaining patients who did not meet federal and state eligibility criteria for hospice benefits. SDH admitted patients who were not "terminally ill," knowingly retained patients who were not "terminally ill," provided services that were intended and designed to be curative and not palliative and falsified documents and patient records including "Recertification Summaries" and other patient care records. The resulting false claims caused the government to pay out funds that they otherwise would not have paid and unlawfully enriched Defendant.

## II. FEDERAL JURISDICTION AND VENUE

8. The acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein occurred in the Southern District of California, and primarily in San Diego, San Diego County, California. Defendant's principal office is located at 4311 Third Avenue, San Diego, California 92103. The registered agent for service of process for SDH is Kathleen Pacurar at the same address. The acts alleged in this complaint were primarily committed in this district. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. §1345.

9. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendant does business in San Diego, California. The Defendant transacts business in the Southern District of California and a substantial part of the acts and omissions proscribed by 31 U.S.C. §3729 *et seq.*, occurred in the State of California.

10. This court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over the Defendant because it does business in the Southern District of California. The San Diego Division is the appropriate Division of this Court to hear a case involving these facilities which are located in San Diego County, California.

11. The facts and circumstances alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

12. Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act. She first provided information to the government relating to this false claims act scheme on or about February 1, 2011.

## III. PARTIES

13. The United States funds the provision of medical care through Government Healthcare Programs such as Medicare, Medicaid, Federal Employees' Health Benefits Program, TRICARE/CHAMPUS, CHAMPVA, and other agencies and programs, acting through the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

14. Relator Lori A. Rachac, R.N. is a citizen of the United States and a resident of the State of California. She was employed by Defendant SDH during periods of time beginning on June 17, 2000. Relator left SDH after about 6 months, returning in October 2005 and continuing until August 2008. Relator left her employment at SDH during these times voluntarily and due to family requirements and emergencies. She was again rehired by SDH on February 6, 2009 and remained on staff until her termination on January 10, 2011.

15. Relator was employed by SDH at various times as a Case Manager, Crisis Care R.N. Supervisor, Shared Care Model Registered Nurse and on the Admissions Team. Relator worked with the interdisciplinary team on patient assessment and case management and had weekly meetings with the team and its members. She documented patient charts through the use of SDH's computerized patient information system known as "MISYS."

16. Relator is a Registered Nurse who received her medical training from the University of the State of New York Regents Program. Relator's California nursing license number is 357288 and is and has been in good standing since being licensed in 1983. She received critical care training and certification through the Veterans Medical Center-San Diego, certification in hospice and palliative care and other continuing education courses and workshops related to end of life care and symptom management. In addition to her experience with SDH she was employed as an ER charge nurse, Hospice liaison and weekend Supervisor at Tri City Medical Center, in Oceanside, California. From 1987 through 2009, she also provided RN staff nursing (part time) services in various intensive care units and emergency rooms in San Diego County including Scripps, Tri-city and Palomar Medical Center hospitals.

17. Defendant San Diego Hospice & Palliative Care Corporation is a California Corporation which receives Internal Revenue Service favorable tax status as a Charitable Corporation under EIN number 953125765. SDH has an approximate annual income of $26 million and assets valued in excess of 20 million dollars. SDH has approximately 870 employees and cares for about 4,000 patients during a one year period. SDH has received hundreds of millions of dollars from Medicare and Medicaid and other government health care programs for the provision of services. Relator estimates that during her employment by SDH about 40% of all SDH patients were not eligible to receive Hospice services under federal and state guidelines.

## IV. INDIVIDUAL PARTICIPANTS

18. Kathleen Pacurar ("Pacurar") is the Chief Executive Officer and President of SDH. She previously provided management services as the hospice's Chief Development Officer. She continued, condoned and encouraged the enforcement of SDH's "Open Access" policy. The Open Access policy resulted in the routine admission and retention of patients who were not eligible to receive Hospice services under federal and state guidelines. Pacurar has admitted that SDH engaged in these illegal practices and estimates that SDH will have to repay millions of dollars to government health care programs because it failed "to make sure that hospice clients met eligibility requirements for reimbursement. Pacurar was a member of management while Jan Cetti was Chief Executive Officer.

19. Jan Cetti ("Cetti") was the Chief Executive Officer of SDH prior to Pacurar and ignored Relator's concerns about the false billing and admissions scheme. Cetti discussed Relator's complaints about the continued violations of the FCA with other management personnel including Betsy Mustol.

20. Betsy Mustol ("Mustol") is and was the Northwest Branch Manager for SDH. She was, at times, Relator's direct supervisor and the head of the interdisciplinary team of which Relator was a member. Mustol regularly coached the nursing employees to falsify patient records so that they could be retained on hospice care and, it is believed, falsified the records of patients when the nursing staff refused to do so. Mustol had access to computerized patient records system which she may have altered.

21. Sharon O'Mary ("O'Mary") was the Director of Patient Care Services and is currently Chief Clinical Officer. She was involved in developing and enforcing the fraudulent scheme. As Director of Patient Care Services, O'Mary was in charge of all geographic branches of SDH and was Mustol's direct supervisor. O'Mary frequently attended staff meetings, preaching that "if people need our help we will bring them on" regardless of their eligibility under Medicare/Medicaid criteria.

22. Gary Buckholz, M.D. was the Northwest Branch Doctor and the physician assigned to Relator's Evergreen team. Buckholz regularly coached and directed nurses to falsify patient records including recertification summaries.

23. Laurel H. Herbst, M.D. was SDH's medical director and medical director during Relator's employment. Herbst was also Vice President for Medical Affairs for SDH making final decisions on the admission of patients. She is currently Faculty Emerita.

24. Steven Oppenheim, MD, FAAHPM is SDH's Chief Medical Director.

25. Bonnie Bell is and was Director of Business Development.

26. Robert Knodle, R.N. was Director of Quality Management for SDH.

27. Elizabeth Menkin, M.D. is and was a member of the Recertification Committee.

/ / /

/ / /

## V. THE FALSE CLAIMS ACT

28. The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the burden on the government and Relators in investigating and prosecuting *qui tam* suits under the FCA.

29. The False Claims Act generally provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements material to a false claim, or conspires to engage in such conduct, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Federal Government.

30. The Act allows any person having information about false or fraudulent claims to bring an action for himself or herself and the Government, and to share in any recovery. Based on these provisions, Relator seeks, through this action, to recover all available damages, civil penalties, and other relief for the state and federal violations alleged herein.

## VI. FEDERAL HEALTHCARE PROGRAMS

31. In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §§1395 to 1395ccc. Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

32. In 1965, the Federal Government also enacted the Medicaid program. Medicaid is the nation's medical assistance program for the needy, the medically-needy aged, blind, and disabled and families with dependent children. 42 U.S.C. §§ 1396-1396v. Medicaid is largely administered by the states and funded by a combination of federal and state funds. The State of California contributes

roughly one-half of Medicaid funding with the federal government providing the balance of the funding.

33. Medicare is the nation's health program for persons over 65 and the disabled. Medicare is funded by the Federal Government.

34. Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury." This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." Medicaid and other federally funded programs restrict coverage under the same principle.

35. Medicare and the other federally funded programs require the submission of documented and properly coded claims which include the implied or express representation that the medical treatment, surgery or procedure was medically necessary.

## VII. HOSPICE CARE

36. When a Medicare (or other government health care) patient is diagnosed as being terminally ill with a prognosis of less than 6 months to live, he may elect to obtain hospice care instead of curative care. 42 C.F.R. §418.24. This election, made by the patient after being advised of his rights, focuses on a family centered multidisciplinary approach to the process of death. The care is described as "palliative" which is defined in 42 C.F.R. §418.3(3) as:

> Palliative care means patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering. Palliative care throughout the continuum of illness involves addressing physical, intellectual, emotional, social, and spiritual needs and to facilitate patient autonomy, access to information, and choice.

All other Medicare benefits are waived during the time of the election and unless it is revoked. 42 C.F.R. §418.24.

37. Federal Rules provide strict guidelines for Hospice providers, patients and care because the Medicare per diem payment is costly to the government: approximately $170 per day per patient enrolled. 42 C.F.R. §418.301 *et seq.* These conditions of participation include a comprehensive

assessment that identifies each potential patient's need for hospice care and services including the need for physical, psychosocial, emotional and spiritual care. 42 C.F.R. §418.52.

38. Hospice rules provide and list the content requirements and time deadlines within which the initial comprehensive assessment must be completed. 42 C.F.R. §418.54. Rules also require updates of the comprehensive assessment by the hospice interdisciplinary group (in collaboration with the patient's attending physician, if any) which must consider changes that have taken place since the initial assessment. This reassessment must be completed at least every 15 days. 42 C.F.R. §418.54(d).

39. The purpose of these and other Hospice laws, rules and regulations are to insure that *only* qualified patients are accepted by Hospice providers and patients who were initially assessed as eligible, but are later found to be or become ineligible, be converted to more conventional treatment and care providers. 42 C.F.R. §§418.22; 418.25; 418.26(a)(2) and (3).

40. Recertification summaries must be completed by care providers every 60 days to document the need for continued hospice care.

41. Each and every hospice care provider, as a condition of participation in the program, must comply with all federal, state and local laws and regulations related to the health and safety of patients. 42 C.F.R. §418.116.

42. When a patient is no longer terminally ill, or fails to qualify because of philosophical opposition to the nature of hospice care or refuses to accept any of the provided services, Hospice care must be terminated and the patient discharged. 42 C.F.R. §418.26(a).

43. According to Pacurar, it was the government's failure to enforce hospice eligibility rules that encouraged hospice providers to keep patients in hospice even when they were not "technically" showing signs of being terminally ill with a life expectancy of 6 months or less. Pacurar claims that many in her industry liken the situation to a small-town stop sign that everyone just rolls on through for years with no consequences. "Suddenly, there's a policeman there and they start writing tickets for everybody. It's not like the rules change: they just started being enforced," she said.

FALSE CLAIMS ACT COMPLAINT

## VIII. SUBSTANTIVE CLAIMS

44. For decades SDH provided hospice and other medical services to the San Diego area. As Medicare and Medicaid payments for Hospice services grew, SDH expanded its facilities and services.

45. On or before December 8, 2005, SDH employed an "Open Access" to patients policy of admitting virtually all patients referred to it for services, whether or not the patient was terminally ill and met the other criteria mandated by federal law and rules regulating Medicare, Medicaid and other federal and California health care laws and regulations.

46. SDH's policy of "Open Access to Patients" violated Medicare and Medicaid requirements and resulted in the admission of patients who were not terminally ill; patients who wanted to obtain expensive curative care instead of palliative care; or patients whose families declined to participate or assist in the provision of hospice services. SDH patient assessments were falsified to show that the patient met federal and state hospice eligibility criteria.

47. Under the "Open Access" policy, many patients were admitted who, although ill and perhaps requiring some assistance with the activities of daily living, were not terminally ill with a prognosis of death within 6 months. Based on the personal knowledge she gained during her work in admissions and with patients, Relator estimates that at any given time, about 40% of the SDH's census were patients who did not meet federal and state eligibility for hospice services.

48. On December 8, 2005, the "Admissions/Intake Department" and staff members, including Relator, received a written memorandum from then Manager of the department, Marilyn Obee, RN, BSN confirming the previously unwritten "open access for patients" policy. This written memorandum was copied to Laurel Herbst, M.D. (medical director), Barbara Radice (Vice President, Customer Support and Chief Information Officer), Nan Johnson (Access Center Director), Deborah Dunne (Chief Administrative Officer and Vice President of Clinical Services), Ben Marcantonio (Southern Regional Director later becoming the Chief Administrative Officer), Sharon O'Mary (Chief Clinical Officer), and Carol Stromberg (Clinical Systems Educator), all high level management for SDH.