49. The December 8, 2005, memorandum provided the "Administrative position on Open Access to Patients." It directed that no patient was to be turned away by Admissions' Nurses. If one of the Admissions nurses considered "turning down services for a referred patient" she was to call the medical officer of the day ("MOD"). That call and the directive given by the MOD had to be documented in the computerized system used by SDH known as "MISYS." This same procedure was to be employed any time that an admissions registered nurse considered declining any type of treatment prescribed for the patient.

50. The December 8, 2005 memorandum directed:

> The Admission RN, Program Rep, or Intake Specialist will always keep "yes" at the forefront while speaking with and/or assessing any patient referred to SDH. If there is an inclination to say "no" to anything (i.e: admission, treatment) a consultative call will be made to the MOD Doc/ Physician on-call and documented in the Misys clinical notes of the patient.

To achieve this "yes" attitude, the MOD doctor virtually always ordered admission. Assessments were also falsified by staff who feared that they would be sanctioned or terminated if they refused to conform to the fraudulent scheme.

51. MOD calls consistently resulted in the admission of the unqualified patients and the provision of questionable and curative services.

52. The admission of patients who did not qualify under Medicare or Medicaid was accomplished through another manipulation of admission standards. While many hospice facilities and physicians rely upon the Karnofsky Index Score and Functional Status scores to determine whether the patient is near the end of life (to meet the less than 6 months of life remaining criteria), SDH's medical director rewrote these standards so that nearly every patient would qualify.

53. Patients were also admitted who did not want to forego curative medicine and who wanted to undertake aggressive treatment to prolong their lives. These patients did not meet hospice eligibility criteria.

54. There was pressure on staff to admit patients who did not meet Medicare/Medicaid criteria, but there was even greater pressure to retain patients whose conditions had improved or who were, in fact, ineligible for hospice when they were admitted.

55. Once admitted, it was extremely difficult to discharge a patient even when it was clear that he/she should not be receiving hospice services. Although patient case files were ostensibly reviewed regularly by an interdisciplinary team consisting of nurses, doctors, social workers and spiritual counselors, staff was afraid to recommend discharge for any patient. In those few situations where discharge was actually considered, the case had to be referred to the certification committee. The certification committee included staff members that were recommending discharge and the SDH Medical Director. As a practical matter, the Medical Director virtually always declined the discharge recommendation and that decision was final.

56. A review or audit of patient files will reveal that there was no justification for the admission or retention of many patients. The files are laden with "creative" misrepresentations directed by the management in order to "meet" federal and state regulations.

57. Relator and other registered nurses at SDH were directed to be "creative" in documenting patient records, and particularly in their "recertification summaries." The recertification summaries documented the need for continuing hospice care. Management and doctors made suggestions to staff about what phrases to use to disguise the fact that a patient was not declining or was even improving.

58. The geographic areas covered by the hospital were divided into Branches. Each branch covered a particular geographic area of the county. Relator was assigned to one of the four teams in the Northwest Branch. Relator's team was known as "Evergreen" and all four of the teams reported to Northwest Branch Manager Betsy Mustol. Mustol and Team Physician Gary Buckholz coached Relator and other nurses to document patient records "creatively" so that the patient could remain on services.

59. One example was a patient, MDLS, who had a diagnosis of chronic obstructive pulmonary disease (COPD). On one of the patient's recertification summaries Relator wrote that the

patient's condition was improving. Specifically she wrote that the patient was gaining weight, had gone out shopping for Thanksgiving dinner and planned on cooking dinner for her family. The Relator saw the patient regularly, and it was clear to Relator that the patient's condition was improving. Dr. Buckholz suggested to Relator that the patient record should falsely reflect that the weight gain was because the patient was "retaining fluid" - which does not indicate improvement.

60. The Relator and other nurses were regularly encouraged at interdisciplinary meetings and on recertification summaries to falsify documentation so that patients could remain on Hospice care. On several occasions when Relator refused to accept the "suggested changes" and falsify the records, Mustol would actually write the recertification summaries for Relator's patient despite having no personal contact with the patient.

61. Mustol also falsified summaries for other nurses who refused to falsify the records. In one of the nurses' meetings where Mustol was coaching Relator and the other nurses in attendance to "creatively" word the recertification summaries, Keith Peyton, R.N. asked sarcastically: "what is this, a creative writing class?"

62. Mustol had access to the MISYS record system and could alter the nurses' entries when a nurse refused to be "creative" and falsify patient records.

63. Every patient day billed to Medicare/Medicaid and other government health care programs by SDH for patients who did not meet the admission criteria or who were improperly retained was a false claim under the FCA and California FCA.

64. Each falsified patient record and Recertification Summary was a falsified document which constituted a violation of the FCA and California FCA.

65. In 2009 Relator began to voice her concerns about the admission and retention of patients who were not terminally ill and otherwise did not meet hospice eligibility criteria. Her complaints to management were ignored.

66. On March 1, 2010, Relator sent an email to Jan Cetti, who was then the Chief Executive Officer of SDH. In the email Relator voiced her concerns, which were shared by other members of the Evergreen team. Cetti then called a meeting of the team. Team members Jeri Stoner, MSW; Kathy

13  FALSE CLAIMS ACT COMPLAINT

Valdevia, Spiritual Counselor, Relator and possibly Carol Andrews CHHA (certified home health aide) attended and voiced concerns about the improper admission and retention practices. SDH management made no changes to these policies despite the meeting.

67. On August 9, 2010, Relator met with Mustol and Human Resources personnel. She was given a "Corrective Action Form" for "persistent negativity which is affecting the Northwest Branch." The final warning encapsulated the problem. It said, in part, that Relator's "disagreement with SDHIPM's philosophy of admission criteria" was one of the bases for her discipline. The Corrective Action document also refers to Relator's negative comments about SDHIPM's policies as relates to patients' hospice appropriateness."

68. As a result, Relator was removed from patient care and transferred to the Admissions department. She was terminated shortly thereafter, on January 10, 2011. One reason provided in her written termination letter was "Openly and consistently disagreeing with San Diego Hospice treatment and practice philosophies."

69. In February of 2011, Relator contacted Carol Littler of the California Department of Human Services to express her concerns about the illegal admission and retention policies at SDH. Relator was encouraged to submit an "anonymous" letter reporting her observations. Relator provided this letter on March 24, 2011.

70. In January 2012, Relator was contacted by Federal Investigators including FBI Special Agent [REDACTED] who debriefed her at length. She subsequently met with federal investigators and Department of Justice personnel.

71. Patients for whom false claims were submitted include, but are **not** limited to, the following whose names were provided by Relator to the government investigators in March 2011. Only the initials of these patients are listed below.

- [REDACTED]
- [REDACTED]
- [REDACTED]
- [REDACTED]

- [REDACTED]

72. An investigation and audit was conducted as a result of the information provided by Relator. In November 2012, Pacurar admitted that doctors and care givers operated for decades on an "open access" policy that kept patients on hospice care for longer than six months, sometimes without being able to demonstrate that their condition was worsening. She admits that: "We lost sight of interpreting these guidelines appropriately. We put the concept of patients, and what we were doing for them above what the guidelines were."

73. Pacurar claimed that the audit was a "wake up call." Pacurar failed to disclose that Relator, who had opposed the illegal practices, had been terminated and silenced.

74. As a result of the fraudulent policies and practices of SDH, false claims were submitted and caused the government to pay out funds that they otherwise would not have paid, unlawfully enriching the Defendant.

## IX. CAUSES OF ACTION

### COUNT I

**FALSE CLAIMS ACT**
**FALSE CLAIM FOR PAYMENT OR APPROVAL**
**31 U.S.C. § 3729(a)(1)(A) and (C) (2010)**

75. Relator repeats and realleges each allegation contained in paragraphs 1 through 74, above as if fully set forth herein.

76. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

77. Defendant, by and through its officers, agents, employees, related companies, subsidiaries and holding companies, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)(2010).

78. Defendant, by and through its officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

79. As a result of the acts of Defendant, the United States Government reimbursed the Defendant and other physicians and hospitals for medically unnecessary hospice care, services, and per diems that it otherwise would not have paid.

80. Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every hospice patient who was not terminally ill with a prognosis of six months or less to live if the illness runs its usual course, or who was improperly retained in hospice without meeting government hospice eligibility criteria, represents a false or fraudulent claim for payment.

81. By reason of Defendant's acts the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Federal health insurance programs have paid for thousands of days of hospice care and costs that they otherwise would not have paid for but for Defendant' fraudulent and illegal conduct.

82. As set forth in the preceding paragraphs, Defendant has knowingly violated 31 U.S.C. § 3729 *et seq.* and have thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendant, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e) That the Court award such other and further relief as it deems proper.

## COUNT II

### FALSE CLAIMS ACT
### FALSE RECORDS OR STATEMENTS
### 31 U.S.C. §3729(a)(1)(B) and (C) (2010)

83. Relator repeats and realleges each allegation contained in paragraphs 1 through 74, above as if fully set forth herein.

84. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

85. Defendant, by and through its officers, agents, employees, related companies, subsidiaries and holding companies, knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) (2010).

86. As set forth in the preceding paragraphs, Defendant's provision of hospice care to unqualified patients defrauded the United States by getting false and/or fraudulent Medicare and other Government health care claims paid in violation of 31 U.S.C. § 3729(a)(1)(C) (2010).

87. Defendant, by and through its officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the fraudulent actions set forth above.

88. As a result of the acts of Defendant the United States Government reimbursed Defendant for hospice care that it otherwise would not have paid.

89. Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every patient who received hospice care which failed to meet the admission and retention rules and criteria was medically unnecessary and represents a false or fraudulent statement.

90. By reason of Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

91. As set forth in the preceding paragraphs, Defendant has knowingly violated 31 U.S.C. § 3729 *et seq.* and has thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendant, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendant(s) caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e) That the Court award such other and further relief as it deems proper.

## COUNT III

**CALIFORNIA FALSE CLAIMS ACT**
**Cal. Gov't Code §§ 12651(a)(1) and (2)**

92. Relator, acting in the name of and on behalf of the State of California, restates and realleges each and every allegation contained in paragraphs 1 through 74 above as if each were stated herein in its entirety and said allegations are incorporated herein by reference.

93. This is a claim for treble damages and penalties under the California False Claims Act.

94. By virtue of the acts described herein, Defendant, for the purpose of defrauding the California State Government, knowingly presented, or caused to be presented false or fraudulent

claims for payment or approval under Medicaid and other California State funded programs, and made, used and caused to be made and used false records and statements material to false claims.

95. Each claim for payment for an inadmissible hospice patient, or a patient who no longer qualified for hospice care or whose records were falsified represents a false or fraudulent claim for payment.

96. Each claim for payment for hospice care that contained false, inaccurate or deceptive billing codes or other false statements constitutes a false or fraudulent claim because such false claims are not covered by the California Medicaid program and other State health care programs.

97. The State of California, by and through the California Medicaid program and other State health care programs, was unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant and paid and continues to pay the claims that would not be paid but for Defendant's wrongful actions and omissions.

98. As a result, California state monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

99. Therefore, the California State Government has been damaged in an amount to be proven at trial.

100. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim made and caused to be made by Defendant and arising from Defendant's conduct as described herein.

101. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

102. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendant, as follows:

(a) State of California be awarded damages in the amount permitted by law;

(b) That civil penalties of $10,000 be imposed for each and every false claim that Defendant caused to be presented to the State's Medicaid or other Government Healthcare Programs under the California False Claims Act;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum amount allowed pursuant to the California False Claims Act; and

(e) That the Court award such other and further relief as it deems proper.

Dated: December 3, 2012

BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

Mark Schlein
Diane Marger Moore
Bijan Esfandiari

*Attorneys for Relator, Lori A. Rachac*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiffs and Relator hereby demand a trial by jury.

Dated: December 3, 2012

BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

Mark Schlein
Diane Marger Moore
Bijan Esfandiari

*Attorneys for Relator, Lori A. Rachac*